**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| 360NETWORKS TENNESSEE, LLC, formerly known as IC FIBER TENNESSEE, LLC, | ) ) ) ) | |
| | ) | CASE NO. 05 C 3198 |
| Plaintiff, | ) | Consolidated with |
| | ) | CASE NO. 05 C 3200 and |
| v. | ) | CASE NO. 06 C 5558 |
| | ) | |
| ILLINOIS CENTRAL RAILROAD COMPANY, an Illinois corporation, | ) ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case arises out of a fiber optic cable installation project along a railroad right-of-way. The parties dispute who must bear the substantial cost of relocating the cable due to the reconstruction of old and decaying timber bridges between Chicago and New Orleans. Plaintiffs 360networks Mississippi, LLC, 360networks Tennessee, LLC, and 360networks Louisiana, LLC have moved for partial summary judgment on liability [111]. For the following reasons, the Court denies Plaintiff's motion for partial summary judgment [111].

**I.    Background**

    **A.    Factual Background**

Defendant Illinois Central Railroad Company ("Illinois Central") owns and operates a railroad between Chicago and New Orleans. 360networks Mississippi, LLC, 360networks Tennessee, LLC, and 360networks Louisiana, LLC (referred to collectively as "360networks") are Delaware limited liability companies that offer communication network services, such as installing and operating fiber optic networks. On May 28, 1999, and again on March 6, 2000, 360networks entered into license agreements with Illinois Central to construct and operate fiber

optic facilities along Illinois Central's right-of-way in Mississippi, Tennessee, and Louisiana (from Chicago to New Orleans) as well as to provide fiber optic cable or transmission capacity to Illinois Central and third parties. In exchange for use of the right-of-way, 360networks paid Illinois Central a fee and provided Illinois Central with limited use of the fiber optic facilities.

At the project's initial "kick-off" meetings in 1999, representatives from Illinois Central and 360networks met to discuss the layout and construction of the fiber optic network along Illinois Central's route. Prior to installation of the fiber optic facilities, Illinois Central informed 360networks of a plan to replace decaying timber bridges with more modern steel and concrete bridges. The agreements required 360networks to install the cables "so as not to unreasonably interfere with [Illinois Central's] operations." As a result, the parties agreed that 360networks would not attach the cable to the existing timber bridges, but instead would use a technique called a "directional bore" to run the cable under the waterway.[1] 360networks claims that the parties agreed to install the cables along the route six feet off of the tracks and four feet down into the ground. Illinois Central agrees that this was the protocol for locations other than bridges or other obstructions, but contends that it told 360networks that the fiber optic facilities should be installed at the edge of the right-of-way at bridges and other obstructions. Minutes from one of the initial meetings indicate that Illinois Central engineer Stan Noyszewski suggested that the cable be installed at the edge of the right-of-way "to avoid possible future conflicts." ¶ 8.1 of Minutes of July 29, 1999 meeting. Other than his brief attendance at the initial meeting, Noyszewski had no additional involvement with this project.

To determine where the cable should be installed in Mississippi, Tennessee, and Louisiana, representatives from Illinois Central and 360networks drove the tracks over a period

---

[1] This technique is substantially more expensive than the more commonly used method of attaching cable to an existing bridge.

of three days in a process known as "hi-railing." 360networks asserts that Illinois Central engineers staked the route, signed off on the placement of cable, and advised 360network representatives how to deal with existing and contemplated obstructions. While Illinois Central disputes its representatives' involvement in the process, it is apparent that representatives from Illinois Central's engineering, bridges, and signals/communications departments, as well as Illinois Central representatives responsible for flagging, safety, and preservation of railroad property, were at least present during the staking and installation. 360networks asserts that in locations where there were multiple bridges close to one another, representatives from 360networks and Illinois Central would walk from bridge to bridge to determine where and how to install the cable. In response, Illinois Central admitted "only that as it relates to bridges which are not part of this litigation 360 and IC may have walked some bridges."

The license agreements provided that 360networks would submit "working drawings" of the route – based on the results of the "hi-railing" – to Illinois Central for approval prior to construction. Illinois Central asserts that 360networks never submitted working drawings, but 360networks claims that Illinois Central engineers approved the working drawings in the field and that the drawings then were submitted to Illinois Central's Midwest division engineer, Dave Lowe. Lowe does not recall receiving the working drawings. In fact, none of the Illinois Central employees deposed recall receiving and reviewing the working drawings, although a few have testified that it is possible that they received the drawings. Further complicating matters, neither party produced the working drawings during discovery; 360networks claims that they were destroyed after installation of the fiber optic cables,[2] and Illinois Central states that it has no

---

[2] According to 360networks, when it declared bankruptcy, all of its offices were closed and employees were sent "to get rid of everything that was inside those offices" because the leased offices had to be emptied before 360networks surrendered them to the landlord. Pl.'s Mot. for Summary Judg. at 11. 360networks maintains that there was no money at the time to organize, collect, and store 360's records

record of receiving the drawings. The license agreements provided that if Illinois Central did not object to any work drawings that were submitted within a specified period of time, then those drawings were deemed approved.

360networks installed the cable over approximately 1,000 miles. For the most part, the cable was installed six feet away from the tracks and approximately four feet underground; however, some cables were closer to the tracks. None of the cable was installed at the edge of the right-of-way. Despite the additional cost, 360networks, as directed by Illinois Central, installed the cable underwater using directional boring rather than attaching the cable to the bridges to help avoid the need to relocate the cable when Illinois Central replaced the bridges in the future.

In August 2002, an Illinois Central construction crew accidentally cut through the fiber optic cable while replacing a bridge near Memphis, Tennessee. Illinois Central claims that this was the first time that it knew that the cable had not been installed on the edge of the right-of-way, while 360networks asserts that Illinois Central had been aware of this fact all along. In September 2002, 360networks gave Illinois Central "as-built" drawings of the route, which showed the begin bore and end bore locations at the bridges. The drawings contain some inaccuracies, and Illinois Central also claims that the drawings are not sufficiently detailed to determine the exact cable placement. Presumably to avoid additional accidents, during several of the bridge replacements, Illinois Central had "sonde locates" performed to identify the exact location of the cable. At these bridges, the locates revealed that the facilities were not installed at the edge of the right-of-way, nor were they installed in a straight line six feet off the track.

---

from those offices, and that the only items kept were things that could be sold such as photocopy machines and other valuable equipment. *Id*.

Eventually, Illinois Central determined that replacement of the bridges required relocating the fiber optic cable, even though the cable was not attached to the bridges. The license agreements address the possibility of cable relocation and provide that 360networks bear the cost of relocation if relocation is ordered by any authority with jurisdiction to do so, but that Illinois Central bear the cost if the relocation is undertaken for any other reason. 360networks (or its agents or employees) relocated the fiber optic cable at or near eight bridges so that Illinois Central could replace those bridges. 360networks demanded that Illinois Central reimburse it for the costs incurred in relocating the fiber optic cable, but Illinois Central has refused.

**B.     Procedural Background**

In 2006, the parties filed cross-motions for partial summary judgment. In 360network's motion, it argued that the license agreements required Illinois Central to bear the cost of relocating the fiber optic cable because Illinois Central was not ordered to undertake the bridge reconstruction by any authority having jurisdiction to make such orders and that the bridge reconstruction was "preplanned work." In response, Illinois Central argued that 360networks should bear the cost of relocating the cable because Illinois Central was ordered to rebuild the bridges by the Surface Transportation Board. Illinois Central also argued that 360networks breached the requirement in the license agreements to perform its work so as not to "unreasonably interfere" with Illinois Central's railroad operations, and that 360networks' material breach prohibits it from recovering.

On May 10, 2007, Judge Leinenweber denied Illinois Central's motion for summary judgment and granted in part 360networks' motion. Judge Leinenweber determined that the license agreements required Illinois Central to bear the cost of relocation unless 360networks

breached the agreements.³ Judge Leinenweber noted that neither party produced working drawings during discovery and concluded that there was a genuine issue of material fact as to whether 360neworks breached the agreements by not installing the cable at the edge of the right-of-way.

### C. Additional Discovery After May 10, 2007 Order

In opposing 360networks' first summary judgment motion, Illinois Central relied principally on an affidavit by Eric Clegg, Illinois Central's Manager of Fiber Optics, and the comments made by Stan Noyszewski at the "kick-off" meeting. Following Judge Leinenweber's ruling on the first round of summary judgment motions, 360networks deposed several additional Illinois Central representatives, including Eric Clegg. Clegg testified that he had no involvement in the negotiation of the license agreements, nor did he have any involvement in the installation or construction of the fiber optic network between Chicago and New Orleans. His role in the dispute began in 2002 and was limited to his evaluation of which bridges needed to be replaced and the effect of those bridge projects on the existing fiber optic facilities. Because he had no personal involvement with the installation and construction of the fiber optic network, his affidavit was based on documents that he received from 360networks and Illinois Central, including meeting minutes, as well as discussions he had with other Illinois Central employees.

360networks also deposed Illinois Central employees David Ferryman, the division engineer for the gulf region, Jerry Tolene, an engineering superintendent, and Roger Morris, who was responsible for negotiating the details of the license agreements with 360networks. Ferryman testified that he instructed other Illinois Central employees to make sure that the running line for the cable was acceptable to Illinois Central, and Tolene testified that he did not

---
³ Judge Leinenweber was not persuaded by Illinois Central's "roundabout" argument that it was ordered to rebuild the bridges by the Surface Transportation Board, and determined that Illinois Central should bear the cost of relocation barring any breach by 360networks. See 5/10/07 Order at 10-12.

recall specifically but thought that he would have followed Ferryman's instructions and approved the running line for the cable. Morris testified that "absolutely" it was "very important for the railroad to have the final say about where the cable was going to be installed within the right-of-way." Ferryman also testified that Illinois Central's input was important, primarily due to the effect on other utilities located in the right-of-way as well as on future construction. Tolene also noted the importance of installing the cable in a location acceptable to Illinois Central. He testified that he was present at various times during and after construction and did not recall objecting to the location of the cable.

Jason Squires, a 360networks construction manager for the southern part of the Chicago to New Orleans route, testified that he worked directly with Illinois Central on the design, layout, and installation of the cable within Illinois Central's right-of-way in Mississippi, Tennessee, and Louisiana. Squires explained in detail the "hi-railing" described earlier and also produced photographs which depicted representatives from both parties participating in the process. Squires testified that Illinois Central approved the location of the cable during the hi-rail process and again when it reviewed the working drawings, which Squires insists were delivered to Illinois Central.

## II. Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette, Ind.,* 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing

party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

**III.   Discussion**

To recover for a breach of contract, a plaintiff must prove, *inter alia*, that it complied with all of its material obligations under the contract. See, *e.g.*, *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001) (citing *Hickox v. Bell*, 552 N.E.2d 1133, 1143 (Ill. App. Ct. 1990)); see also *Normand v. Orkin Exterminating Co.*, 193 F.3d 908, 912 (7th Cir. 1999) (explaining that breach of contract claim fails if plaintiff failed to satisfy condition precedent to defendant's performance); *Brenner v. Greenberg*, 2009 WL 1759596, at *5 (N.D. Ill. June 18, 2009) (noting that, at a minimum, breach of contract plaintiff must perform all conditions precedent under a contract). Where a party has materially breached a contract, it will not be permitted to take advantage of any contract terms or recover damages from the other party to the contract. See

*Advance Iron Works, Inc. v. John Edwards Const. Co.*, 2004 WL 2044123, at *9 (N.D. Ill. Sept. 9, 2004) (citing *Robinhorne Const. Corp. v. Snyder*, 251 N.E. 2d 641, 646-47 (Ill. App. Ct. 1969)). Illinois Central contends that genuine factual issues remain as to whether 360networks satisfied its contractual obligations to install the facilities "so as not to unreasonably interfere with [Illinois Central's] operations," and thus 360networks is not entitled to summary judgment. Illinois Central further argues that, even if it approved the running of the line "generally" along its track, 360networks has not established that the layout was approved at the specific bridges at issue in this litigation and, particularly, that 360networks did not follow its instruction to install the cable at the edge of the right-of-way.

### A. Working Drawings

In the midst of all the factual disputes between Illinois Central and 360networks, the parties agree that no "working drawings" have been produced in this litigation. Although 360networks has come forward with additional deposition testimony from one of its employees, Jason Squires, that the drawings were delivered to Illinois Central prior to the installation of the fiber optic facilities, Illinois Central employees still maintain that they either did not receive the drawings or that they do not recall receiving the drawings. Although the lease agreements provide that the "[f]ailure of [Illinois Central] to notify [360networks] within the applicable time period of its disapproval of the Working Drawings shall be considered approval by [Illinois Central]," the question of whether Illinois Central ever had the chance to approve those drawings remains in dispute. Thus, at this stage of the litigation, Illinois Central's failure to voice disapproval with the drawings cannot be deemed approval.

In addition, even assuming that the working drawings existed at some point and were delivered to the appropriate personnel at Illinois Central, 360networks' failure to produce the

drawings in this litigation leaves open a question as to what exactly the drawings detailed and whether the working drawings addressed the location of the facilities at the bridges in sufficient detail.[4] Illinois Central claims that 360networks' own project manager admitted that the drawings only showed the begin bore location on one side of the bridge and the end bore location on the other side of the bridge, with no indication of where the running line would be between the end and begin bore locations. See Iain Morris Dep. at 32-33. As Judge Leinenweber already concluded with respect to arguments about the significance of the working drawings, "as no drawings have been submitted to the Court, such claims will not be evaluated." 5/10/07 Opinion at 9. Instead, because the drawings have not been produced by either side, and the parties dispute the contents of the drawings, it is for the trier of fact to decide what the working drawings contained. See Fed. R. Evid. 1008 ("When an issue is raised * * * whether other evidence of contents correctly reflects the contents, the issue is for the trier of fact to determine as in the case of other issues of fact."); see also *Davis v. Baron's Creditors Service Corp.*, 2001 WL 1491503, at *4 (N.D. Ill. Nov. 20, 2001).

### B. Installation of the Cable

Illinois Central contends that because the cable was installed close to the bridges, and not at the edge of the right-of-way, the installation "unreasonably interfered" with Illinois Central's operation. However, as Judge Leinenweber previously pointed out, "if [Illinois Central] agreed to or approved the specific placement of the cable, it cannot very well argue that the placement 'unreasonably interfered' with its operations." 5/10/07 Opinion at 9. The problem that

---

[4] 360networks claims that Illinois Central's "inability to produce any working drawings or other documents related to this project is based on [Illinois Central's] failure to conduct a reasonable search, not on the non-existence of the documents. Pl.'s Motion for Summary Judg. at 14. If 360networks had reason to doubt Illinois Central's assertion that it does not have the working drawings, 360networks' concerns could (and should) have been raised in a motion to compel or another appropriate discovery motion. In addition, as noted above, 360networks also has failed to produce the working drawings.

10

360networks faced in bringing its first motion for summary judgment, and that it continues to face now, despite having conducted additional discovery, is that there is no *undisputed* evidence that Illinois Central agreed to or approved the location of the cable.

360networks relies heavily on the testimony of its own employee, Squires, to support its position that Illinois Central approved the location of the cable. Squires testified that the railroad approved the layout of the fiber optic cable along the route generally (see Squires Dep. at 175.14-176.5), as well as along the bridges in Tennessee, Mississippi, and Louisiana (see *id*. at 173.18-22). He also testified that Illinois Central required the cable to be installed six feet from the tracks unless otherwise directed and that the default rule was not rigid because the parties would adjust to the conditions and obstacles found at each bridge.

But Squires' testimony must be weighed against the minutes from the "kick-off" meeting, which reveal that Illinois Central engineer Stan Noyszewski advised both 360networks and Illinois Central representatives that the cable should be installed at the edge of the right-of-way. While this suggestion came at one of the initial meetings on the project, from an engineer who did not have further responsibilities with this project, it nonetheless was memorialized in the meeting minutes and recalled by various witnesses from both parties. At trial, 360networks can contest the importance of Noyszewski's single assertion, and contrast it with the detailed testimony of Squires – along with any other relevant and admissible evidence that either party may introduce on that subject. However, at this stage, the Court cannot weigh Noyszewski's undisputed statement and the meeting minutes versus Squires' testimony, nor can it make the assumptions that 360networks' position would require it to make. See, *e.g.*, *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 856 (1982) ("Determining the weight and credibility of the evidence is the special province of the trier of fact"); *Thakore v. Universal Machine Co.*, 2008

11

WL 4066418, at *3 (N.D. Ill. Aug. 28, 2008) ("only a trier of fact may properly assess the credibility and weight of the conflicting evidence").

For instance, while Squires testified that Illinois Central personnel participated in the hi-railing process, any additional input (or lack thereof) from Illinois Central during those excursions may have been subject to its initial directive to place the cable at the edge of the right-of-way near bridges. On a similar note, Illinois Central representatives may have been present during installation of the facilities, but they may have thought that 360networks was hewing to the original caveat at the bridges. And the bore profiles produced in this litigation demonstrate that while the facilities were not installed at the edge of the right-of-way, where Illinois Central claims they should have been, they also were not installed in a straight line six feet off the track, which 360networks claims was the agreed location. If the working drawings actually had been produced in this litigation, the parties and the Court might have a better idea of the level of detail that was discussed between the parties prior to and during installation, but without those documents, the Court can only make assumptions.

The Court appreciates 360networks' frustration with the lack of recall by Illinois Central representatives on many issues surrounding this project, but Illinois Central has come forward with enough evidence to create a genuine issue of fact. Viewing the evidence in the light most favorable to Illinois Central, and drawing all reasonable inferences in its favor, there is evidence that Illinois Central told 360networks to install the cable at the edge of the right-of-way and that 360networks did not do so. While Illinois Central's evidence "may not be as complete as one would like to see presented * * * the proper comparison is not to an ideal case, but to the minimum required to survive a motion for summary judgment." *Covalt v. Carey Canada, Inc.*, 950 F.2d 481, 485 (7th Cir. 1991). And while 360networks may feel that, at this stage, it has

presented considerable evidence that may weigh in its favor, there is "sufficient evidence supporting the claimed factual dispute * * * to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat. Bank v. Cities Service*, 391 U.S. 253, 288-89 (1968).

**IV.     Conclusion**

For the reasons stated above, the Court respectfully denies Plaintiff's motion for partial summary judgment [111].

Dated:  October 26, 2009

Robert M. Dow, Jr.
United States District Judge